UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CRIMINAL ACTION NO. 24-6-DLB-CJS

UNITED STATES OF AMERICA                                PLAINTIFF

VS.                  **MEMORANDUM OPINION AND ORDER**

CHAD CHRISTOPHER TAYLOR                        DEFENDANT

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court upon Defendant Chad Christopher Taylor's Motion to Suppress (Doc. # 35). After the United States filed its Response (Doc. # 43), the Court conducted an evidentiary hearing on the Motion on June 7, 2024 (Doc. # 47). Defendant was present for the hearing and was represented by Attorneys Steven N. Howe and Wilbur M. Zevely. The United States was represented by Assistant United States Attorney Kyle M. Winslow. At the conclusion of the hearing, the Court took the Motion under submission. For the reasons set forth herein, Defendant's Motion to Suppress (Doc. # 35) is **denied**.

I.      ISSUES RAISED

In his Motion, Defendant moves the Court to suppress evidence seized during a "knock and talk" conducted at Defendant's residence on November 30, 2023. (Doc. # 35). Defendant asserts that the evidence should be suppressed because the knock and talk "became coercive and exceeded the scope of a consensual encounter," constituted a "constructive entry" into Defendant's residence, and therefore amounted to an unreasonable seizure under the Fourth Amendment. (*Id.* at 3-4).

1

In response, the United States argues that officers "consensually encountered . . . Defendant at the front door of his residence," and that accordingly "there is no Fourth Amendment violation." (Doc. # 43 at 3). Alternatively, the United States argues that even if the knock and talk amounted to a constructive entry, "exigent circumstances, an exception to the warrant requirement, would have justified the entry." (*Id.* at 5-6). The United States also argues that the frisk of Defendant after he exited his residence was based on "reasonable suspicion that . . . Defendant was armed and dangerous when he exited his residence" and was therefore permissible under the Fourth Amendment.[1] (*Id.* at 3-4).

## II.   FINDINGS OF FACT

During the evidentiary hearing held on June 7, 2024, the Court heard testimony from three witnesses from the Boone County Sheriff's Office (the "BCSO"): (1) Detective Everett Stahl, (2) Sergeant Jared Horton, and (3) Deputy Jerald Wilmes. Defendant did not call any witnesses, nor did he testify on his own behalf. Weighing the credibility of the witnesses, and considering the exhibits admitted during the hearing, the Court makes the following factual findings:

1. At around 5:00 a.m. on November 29, 2023, officers with the BCSO received a phone call from someone who was walking a dog near Defendant's residence. The caller reported that Defendant's garage door, a door leading from Defendant's garage into his residence, and a window above Defendant's garage door were each open.

2. Shortly thereafter, officers with the BCSO arrived at Defendant's residence. There, officers observed what the caller had reported as well as a broken glass bottle on

---

[1] During the evidentiary hearing, defense counsel expressly disclaimed any challenge to the legality of the frisk itself. Therefore, the Court need not address that issue.

the floor of Defendant's garage. Concerned that an active burglary was taking place, the officers entered Defendant's residence and conducted a protective sweep. The officers did not find any individuals in the residence, but they smelled freshly burnt gunpowder and discovered spent shell casings as well as four bullet holes in the walls of the residence.

3. At around this time, Detective Stahl spoke with Defendant's downstairs neighbor. Defendant's downstairs neighbor told Detective Stahl that two days earlier he heard what sounded like two dumbbells being dropped on Defendant's floor. According to Detective Stahl, this sound could mimic the sound of gunshots.

4. Detective Stahl also made contact with Defendant's father. Defendant's father told Detective Stahl that the night before, Defendant sent text messages to his father indicating that Defendant was "in trouble" and that there were people "out to get him." Defendant's father also told Detective Stahl that Defendant had been hallucinating and "seeing people." Given the circumstances, Detective Stahl became concerned for Defendant's safety. Detective Stahl gave his contact information to Defendant's father and requested that he contact Detective Stahl if he heard from Defendant. Later, Defendant's father called Detective Stahl and informed him that Defendant was staying at a nearby hotel.

5. At around noon on November 29, 2023, Detective Stahl and three other officers traveled to the hotel to speak with Defendant. Detective Stahl and the other officers made contact with Defendant at the hotel. Upon arrival, Defendant was groggy, disheveled, and appeared to be under the influence of narcotics. Defendant also appeared to be exhibiting symptoms of paranoia. When asked about any recent drug

use, Defendant admitted that he last used methamphetamine a day and a half prior to speaking with the officers at the hotel. When asked about the bullet holes officers discovered at his residence, Defendant stated that he was there when the shots were fired but denied having fired them. Based on Defendant's demeanor and statements, Detective Stahl became concerned about Defendant's physical and mental health. Detective Stahl then asked Defendant if he would agree to go to the hospital. Defendant consented and was transported to St. Elizabeth Hospital.

6. Later that same day, officers obtained a state search warrant for Defendant's residence.[2] In executing the search warrant, officers discovered four spent shell casings, firearm magazines, ammunition, and an empty handgun holster. Officers also discovered a plastic baggie together with some excrement in Defendant's toilet. According to Detective Stahl, the plastic baggie indicated that Defendant was possibly engaged in transporting narcotics inside his body. At around this time, Detective Stahl learned that Defendant had a prior felony conviction for drug trafficking.

7. Officers also obtained a search warrant for Defendant's vehicle, which had been towed to the BCSO. In executing the vehicle search warrant, officers discovered an unspent 9-millimeter round in Defendant's vehicle. Shortly thereafter, Detective Stahl discovered that Defendant had travelled to and from Mexico on several occasions. After consulting with narcotics officers, Detective Stahl understood that Defendant's travel patterns in Mexico could be indicative of someone engaged in drug trafficking.

---

[2] During the evidentiary hearing, defense counsel asserted that he had no issue with the warrants that were issued in this case, including the two search warrants for his vehicle mentioned below.

4

8. Detective Stahl then requested that a narcotics K-9 unit be brought out to Defendant's vehicle. The K-9 conducted a free air sniff of Defendant's vehicle and alerted at the driver's side door. Based upon the above information, officers obtained a second search warrant for Defendant's vehicle. In executing this second search warrant, officers discovered a baggie containing 6.5 grams of methamphetamine underneath the driver's seat.

9. Shortly thereafter, Defendant's next-door neighbor called the BCSO and spoke with Sergeant Jared Horton. The neighbor reported to Sergeant Horton that Defendant had returned to his residence. The neighbor also reported that fifteen minutes prior to her call Defendant told her husband that there were people living in Defendant's attic and walls and that his vehicle and home were "bugged."

10. Soon thereafter, Sergeant Horton, Deputy Wilmes, and Deputy Waymeier separately travelled Defendant's residence. The officers arrived at Defendant's residence at approximately 5:22 p.m. The officers went to Defendant's residence principally to conduct a welfare check. However, the officers also believed that they had probable cause to arrest Defendant for possession of the methamphetamine found in his vehicle. The officers did not have a search warrant for Defendant's residence or an arrest warrant for the Defendant.

11. After arriving at Defendant's residence, Sergeant Horton and Deputy Wilmes made contact with Defendant's next-door neighbor. She told Sergeant Horton and Deputy Wilmes that she was not sure whether Defendant was still at his residence. She also told Sergeant Horton and Deputy Wilmes that Defendant had mentioned having sold methamphetamine and cocaine in the past.

12. Sergeant Horton then walked up to Defendant's front porch and shined a flashlight into Defendant's residence. Deputy Wilmes initially stood behind Sergeant Horton while he was on Defendant's porch. Deputy Wilmes then shined a flashlight through a window into Defendant's garage. Shortly thereafter, Sergeant Horton knocked on Defendant's front door. There was no response. After waiting for a few seconds, Sergeant Horton shined a flashlight into Defendant's residence for a second time. Approximately 50 seconds after he first knocked on Defendant's front door, Sergeant Horton knocked on Defendant's front door a second time, again with no response. Sergeant Horton then stepped away from Defendant's front porch and walked to the next-door neighbor's driveway.

13. Shortly thereafter, Deputy Wilmes then stepped onto Defendant's front porch. Upon Deputy Wilmes' entry onto the front porch, Defendant opened his front door slightly, peering out from the doorway. In response, Deputy Wilmes said "Hey, Chad. Hey, come out here and talk to me, dude." Defendant then began to step outside. Defendant's hand was visibly inside his left pocket when he began to exit his residence.

14. Deputy Wilmes then calmly stated "Hey, keep your hands out of your pocket, man. No hands, no hands. Come out and talk to me. You're all good. Come out and talk to me." Deputy Wilmes did not raise his voice when talking to Defendant. Deputy Wilmes also waved Defendant outside of his residence. Defendant removed his left hand from his pocket. Defendant then began to step outside onto his front porch. As Defendant stepped out of his residence, Deputy Wilmes was the only officer present on the porch. Deputy Wilmes then took hold of Defendant's left wrist "to prevent it from going back in his pocket." Sergeant Horton's body camera footage shows Defendant having

6

already crossed the threshold of his front door when Deputy Wilmes touched Defendant's wrist.

15. After Defendant stepped out onto his front porch, Sergeant Horton and Deputy Waymeier approached Defendant and Deputy Wilmes. None of the officers present drew their weapons at any time. After Defendant exited his residence, Deputy Wilmes asked Defendant if he had any weapons on him. In response, Defendant said "no." Deputy Wilmes then conducted a frisk of Defendant's person. The frisk revealed a cellphone and a loaded magazine in Defendant's left pocket and a firearm in Defendant's right pocket. Defendant was then arrested.

**III. ANALYSIS**

In his Motion to Suppress, Defendant argues that the evidence officers found on his person should be suppressed because the knock and talk "became coercive and exceeded the scope of a consensual encounter," constituted a "constructive entry" into Defendant's residence, and therefore amounted to an unreasonable seizure of Defendant under the Fourth Amendment. (Doc. # 35 at 3-4). In response, the United States principally argues that officers "consensually encountered . . . Defendant at the front door of his residence," and that accordingly "there is no Fourth Amendment violation." (Doc. # 43 at 3).

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. This amendment's protection of the home extends to the curtilage, which is "the area immediately surrounding and associated with the home" and is considered "part of the home itself for

7

Fourth Amendment purposes." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (internal quotation marks omitted). "When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred," and [s]uch conduct . . . is presumptively unreasonable absent a warrant." *Collins v. Virginia*, 584 U.S. 586, 593 (2018).

However, "a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *Jardines*, 569 U.S. at 8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). Indeed, "[t]he Sixth Circuit has held that a police officer knocking on the front door of a home to speak with the occupant—colloquially referred to as a 'knock and talk' procedure or technique—is generally permissible, provided it is consensual." *United States v. Mills*, 372 F. Supp. 3d 517, 530 (E.D. Mich. 2019) (citing *Smith v. City of Wyoming*, 821 F.3d 697, 713 (6th Cir. 2016)). "[T]he officers' right to enter the property like any other visitor comes with the same limits of that traditional invitation: typically . . . approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Morgan v. Fairfield Cnty., Ohio*, 903 F.3d 553, 563 (6th Cir. 2018) (quoting *Jardines*, 569 U.S. at 8) (internal quotation marks omitted).

Additionally, "[a]n officer may initiate a knock and talk without any objective level of suspicion," and the "technique is permissible so long as the encounter does not evolve into a constructive entry[.]" *Pritchard v. Hamilton Twp. Bd. of Trs.*, 424 F. App'x 492, 499 (6th Cir. 2011). A constructive entry occurs "when the police, while not entering the house, deploy overbearing tactics that essentially force the individual out of the home." *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005). The Sixth Circuit has

8

identified four "hallmarks of constructive entry": "(1) drawn weapons; (2) raised voices; (3) coercive demands; or (4) a large number of officers in plain sight." *United States v. Grayer*, 232 F. App'x 446, 450 (6th Cir. 2007) (collecting cases); *see also Thomas*, 430 F.3d at 277-78 (collecting cases). Whether police action gives rise to a constructive entry depends upon the totality of the circumstances. *See United States v. Raley*, No. 4:20-cr-00014-JHM, 2022 WL 2834677, at *3 (W.D. Ky. July 20, 2022).

Before addressing whether the officers' actions in this case gave rise to a constructive entry, the Court finds it appropriate to briefly acknowledge the circumstances leading up to the knock and talk. In the day or so preceding the knock and talk, officers learned that Defendant had recently engaged in erratic and seemingly paranoid behavior, such as (i) stating that people who were "out to get him" were living in his walls and attic, (ii) stating that his residence was "bugged," and (iii) potentially shooting through the walls of his residence, among other examples. The officers learned of this behavior from two of Defendant's neighbors, Defendant's father, and Defendant himself. According to Detective Stahl, the information he and other officers learned about Defendant's behavior and state of mind led him to be concerned about Defendant's well-being. Moreover, although the officers believed they had probable cause to arrest Defendant for possession of the methamphetamine found in his vehicle, one of their stated purposes for going to Defendant's residence was to conduct welfare check.[3] The Sixth Circuit has noted that

---

[3] During the evidentiary hearing, defense counsel appeared to take issue with the fact that the officers arrived at Defendant's residence with the intent to make an arrest. But to the extent Defendant seeks to challenge the officers' actions on this basis, such challenge lacks merit. Indeed, "[i]n the Fourth Amendment context, . . . [courts] have almost uniformly rejected invitations to probe subjective intent." *Nieves v. Bartlett*, 587 U.S. 391, 403 (2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 737 (2011)) (internal quotation marks omitted); *see also Thomas*, 430 F.3d at 280 ("[I]t is well established that the state of mind of arresting police officers does not establish whether a seizure in general or a constructive entry in particular has occurred.").

where police have "reasonable grounds to be concerned for the safety" of a house occupant, it is "reasonable to go to the . . . home and attempt to learn more through consensual questioning[.]" *Ewolski v. City of Brunswick*, 287 F.3d 492, 504 (6th Cir. 2002); *see also Raley*, 2022 WL 2834677, at *3 (noting the general permissibility of "[k]nocking on the front door of a home . . . to speak with an occupant as part of a welfare check[.]").

Considering the totality of the circumstances, and for whatever reason the officers had for going to Defendant's residence, the Court concludes that the knock and talk procedure used here did not give rise to a constructive entry. As discussed above, the hallmarks of a constructive entry are drawn weapons, raised voices, coercive demands, or many officers in plain sight. *Grayer*, 232 F. App'x at 450. None of these tactics were used here. Based on the evidence presented at the evidentiary hearing, none of the officers ever drew their weapons or raised their voices. Moreover, the Court concludes that no officer made any coercive demands of Defendant.

Deputy Wilmes was the only officer that spoke to Defendant before and as he exited his residence. In pertinent part, Deputy Wilmes asked Defendant three times to "come out and talk to [him]" and motioned Defendant outside. Such statements and gestures are far less forceful than those the Sixth Circuit has recognized as coercive. *See Thomas*, 430 F.3d at 277-78 (collecting cases from various jurisdictions involving drawn weapons, spotlights, bullhorns, loudspeakers, yelling officers, and orders for a defendant to "leave [his] trailer and drop to his knees[.]"); *see also Grayer*, 232 F. App'x at 450 (officers "ask[ing] [the defendant] to step outside" did not give rise to a constructive entry).

Moreover, Defendant does not cite—and the undersigned is unaware of—any authority finding statements comparable to those at issue here to be coercive.

Furthermore, although Deputy Wilmes told Defendant to "keep [his] hands out of [his] pocket" and touched Defendant's wrist, all of this occurred after Defendant had already begun exiting his residence. Defendant does not adequately explain how such actions in the circumstances could give rise to a constructive entry. *See Thomas*, 430 F.3d at 277 (noting that a constructive entry involves tactics "that essentially force the individual *out of the home*.") (emphasis added). Finally, only Deputy Wilmes was present on the porch and visible to Defendant when he opened the door. The other two officers stood toward the front of Defendant's residence and were not in Defendant's line of sight.

Based on the record, the arguments presented, and the authority cited, the Court concludes that the knock and talk did not give rise to a constructive entry and was therefore consensual. Thus, the Court rejects Defendant's proffered ground for suppressing the evidence at issue.[4]

### IV.  CONCLUSION

Accordingly, for the reasons stated herein, Defendant Chad Christopher Taylor's Motion to Suppress (Doc. # 35) is **DENIED**.

This 1st day of July, 2024.



Signed By:
David L. Bunning
United States District Judge

---

[4] Having concluded that the knock and talk procedure did not give rise to a constructive entry and was therefore consensual, the Court need not address the United States' separate exigency argument.